## Dupuy, Curator, *v.* Bemiss.

Whenever the courts of the United States have jurisdiction *ratione personæ*, their jurisdiction *ratione materiæ* extends to all cases within the pecuniary limits fixed by law. Their jurisdiction is not limited or restrained by the local remedies of the different States.

The fact of a succession being under administration in a Court of Probates as constituted under the judicial organisation existing anterior to the constitution of 1845, could not deprive a Circuit Court of the United States of jurisdiction to order the sale of property forming part of the succession.

In proceedings *viâ executivâ* no citation is necessary. The proceedings are *in rem*, and notice of the order of seizure and sale is all that is necessary to be given to the debtor.

Where a sale has been made by order of a court, whose jurisdiction over the subject matter appears on the face of the proceedings, errors or mistakes committed by it cannot be corrected or examined when brought up collaterally.

APPEAL from the District Court of Madison, *Curry*, J. *J. Dunlap*, for the plaintiff. *Bemiss*, appellant, *pro se.* The judgment of the court was pronounced by

Dupuy
v.
Bemiss.

Eustis, C. J.   *Claudius Gibson*, a citizen of this State, and an inhabitant of the parish of Carroll, died therein, in the month of June, 1841, and, in October following, *Thomas V. Davis*, a citizen and inhabitant of this State, was appointed administrator of his succession, and took possession of the effects thereof, and undertook the administration of the same, under an order of the Court of Probates of the parish of Carroll.   In the month of May previous, *Tobias Gibson*, a citizen of the State of Kentucky, had obtained a judgment against the deceased in the District Court for the parish of Carroll, for the sum of $33,100, with interest.   In December, 1841, *Tobias Gibson* filed his petition in the Circuit Court of the United States, for the fifth circuit, district of Louisiana, in which he alleges the recovery of this judgment, and that under an execution issued on said judgment a seizure had been made of certain slaves and moveables, described in the return of the execution, which was made after the death of *Claudius Gibson*, without selling any portion of the property seized.   It is alleged that *Thomas V. Davis*, curator of the succession of *Claudius Gibson*, had taken charge of the estate of the deceased, and particularly of the property mentioned in the return of this execution.   Executory process is asked against the property seized as aforesaid, for the payment and satisfaction of the judgment, and the petition concludes with a prayer for general relief.   An order for the seizure and sale of the property described was made by the judge, dated the 2d December, 1841, which was executed by the seizure and advertisement for sale of the slaves by the marshal.

On the 11th January, 1842, at the instance of *Davis*, administrator, all proceedings under the process issued in this case were enjoined, by order of the judge.   The bill filed by *Davis* to obtain an injunction, sets forth the pending administration of the succession, the existence of various conventional and judicial mortgages against it, his refusal to recognise the debt claimed by *Tobias Gibson*, and the pendency of a suit between *Gibson* and himself, as administrator, for the recognition and enforcement of this very mortgage debt.   He charges that the judgment, mortgage, or debt, on which the order of seizure and sale was granted, was fraudulent and simulated ; he denies the existence of the debt itself; and alleges that the judgment was given in fraud of the rights of other creditors.   The responsibility of the administrator to the Court of Probates under which he was appointed, and to which he is solely answerable, is pleaded ; and also the consequent injury to other creditors, whose rights to be paid will be sacrificed by the appropriation of the property seized to the exclusive payment of *Tobias Gibson's* claim.   The power of the judge to grant the order of seizure and sale is expressly denied, and the validity of the proceedings under it are put at issue.   Process is prayed for against *Gibson* and the marshal, and the prayer of the bill is, that the injunction be made perpetual, and the property seized be returned to the complainant, as administrator ; that the pretended debt claimed, be decreed to be fraudulent and simulated, or the judgment itself be held to be fraudulent as to other creditors; a decree is also asked for the sum of $50,000 against *Gibson*, for the value of the slaves, their hire, costs, damages, &c.

To this bill *Tobias Gibson* filed an answer on the 29th January, 1842, in which the matters charged in the bill are put at issue, all fraud and collusion are denied, and the validity of the debt, judgment, and mortgage are asserted.

On the 14th March, 1844, the bill, by a decree of the court, was dismissed, "the said bill not averring, nor proof having been exhibited on the hearing of

this cause, that the said creditors, represented by said *Davis*, are entitled to resort to the jurisdiction of this court, or that they, or any of them, have exhausted their rights at law, and so rendered the interference of this court proper." The injunction was dissolved, and the proceeds of the slaves sold were decreed to be applied to the payment of the judgment of *Tobias Gibson.*

It is in relation to the sale of those slaves that the difficulty raised by the litigation in this case arises. On the 22d of January, 1842, a rule was taken ordering the counsel for the defendant to show cause why the slaves and moveables seized should not be sold, the former on a credit of one year and the latter of ninety days, the proceeds to be paid into court, to await its further order; and on the 24th, there being no opposition made thereto, it was made absolute, and the property ordered to be sold accordingly; the sale to be made in the parish of Carrol, after thirty days' advertisement. This order of sale does not appear to have been acted upon, and on the 19th of February was rescinded at the instance of another litigant, *William Hunt.* On the 17th of February, *Hunt* filed his bill before the same court, representing that he was a creditor of the late *Claudius Gibson* in the sum of $10,000, with interest, which debt was secured by a special mortgage on the slaves seized at the instance of *Tobias Gibson,* which had a priority over that resulting from the judgment which *Gibson* was seeking to enforce under the order of seizure and sale; that his, *Hunt's,* was the first mortgage on the slaves; that the act by which it was given imparted a confession of judgment, and contained the pact *de non alienando;* that the proceedings of *Tobias Gibson* against *Davis,* administrator, which had been instituted, and which are made part of the bill, were collusive and for the purpose of depriving him of his priority in the payment of his special mortgage; that said proceedings were unlawful; and that the seizure of the slaves by the marshal was without warrant, the administrator having the sole right to dispose of them under the authority of the Court of Probates. *Tobias Gibson, Davis,* the administrator, and the marshal, were made parties to this bill, and a decree was asked that the slaves be seized and sold according to law by the marshal, and the proceeds applied to the extinguishment of the complainant's mortgage; and that said sale be made in New Orleans, at the most suitable place. It was alleged that if made as directed by the order of the court, in the order of the 22d January, 1842, the security of the complainant's debt would be endangered, and therefore all proceedings under such order are asked to be enjoined until the further order of the court. Accordingly, on the application of this party, the first order was rescinded, and another was made of date the 19th of February, 1842, by which the slaves were ordered to be removed to New Orleans, and sold at public auction after the usual and legal advertisements, the proceeds to remain subject to the further order of the court. There are directions concerning the security to be given by purchasers, which it is not material to mention in detail.

*Tobias Gibson* demurred to *Hunt's* bill, and his demurrer was sustained, and the cause remanded to the rules for proceedings against the other defendants. Judgment, *pro confesso,* was taken against *Davis,* administrator, who made no answer, and a final decree was entered and executed, by the payment by preference of the debt and interest out of the proceeds of the slaves, which were sold under the order of the court of the 19th February, 1842. At this sale the present defendant purchased the slaves mentioned in the plaintiff's petition, which are the subject of the present suit.

It appears that the present plaintiff, *Samuel Dupuy*, was appointed curator of the vacant succession of the late *Claudius Gibson*, and has instituted a petitory action for these slaves against the defendant as belonging to the succession represented by him. The defendant relies upon the validity of the sale under the facts which have been explained.

I. The most important question to be determined, relates to the jurisdiction of the court under which the sale was made. The case arising before the present organisation of the courts of this State, the jurisdiction of the Court of Probates referred to is that which existed previous to the adoption of the present constitution. The proposition is, that the Circuit Court of the United States had no jurisdiction to order the sale of the property of a succession while under administration, and under the superintendence and authority of the Probate Court. This principle is not only maintained in argument with evident conviction on the part of counsel, but has had, to a certain extent, the support of authority. If it be true, it is most important in its operation on the the judicial power of the courts of the United States, as well as on that of the States, and presents one of the most serious questions which a court can be called upon to determine.

The Circuit Courts of the United States have cognisance, in concurrence with the courts of the States, of all suits of a civil nature, at common law or in equity, where the matter in dispute exceeds $500, between the parties designated by law under the constitution of the United States. The latter, in creating the judicial power, intended it to extend *to all cases in law and equity*, whenever it had jurisdiction over the persons. And it seems to conflict with this power, that a State, by creating a special jurisdiction over particular classes of cases, should to that extent exclude the jurisdiction of the courts of the United States. Let us suppose that actions of partition were required to be brought before a particular court, and that no other court could, by a State law, take jurisdiction of them, would the judicial power vested in the Circuit Courts of the United States be affected by such a limitation of jurisdiction?

The most obvious impression produced by a consideration of the constitution of the United States, and the laws made under it for the organisation of the judicial power, certainly is, that whenever their courts have jurisdiction by reason of the person, their jurisdiction *ratione materiæ* extends to all cases in law and equity, within the pecuniary amount by which it is limited.

In *Suydam and others* v. *Broadnax and others*, 14 Peters' Reports, 75, a case very similar to this, that principal was recognised by the Supreme Court of the United States, and we have met with no decision other than those we shall notice, in which a contrary doctrine has been maintained. On the contrary, it is the settled jurisprudence of the United States, that the jurisdiction of their courts is not limited or restrained by the local remedies of the different States. *Robinson* v. *Campbell*, 3 Wheaton, 212. 4 Ib. 115. There have been several cases decided by the late Supreme Court on this subject, to which our attention has been directed; we have fully considered them and will proceed to notice them.

*Lowry, Curator,* v. *Erwin,* 6 Rob. 196. In this case the court came to the conclusion that the Circuit Court of the United States was without jurisdiction, *ratione personæ*. The defendant held under a sale made by the marshal of the United States, under the authority of an order of seizure and sale granted at

the instance of a creditor against a plantation and slaves in the possession of an executor, and the court proceeded and determined that, the Circuit Court of the United States was without jurisdiction or authority to issue the order of seizure and sale against the executor.

The creditor, at whose instance the order of seizure and sale was made, obtained it on an act of special mortgage on the property directed to be seized and sold, and the principal reason which is given for the want of authority in the Circuit Court to grant the order was, that no such process could issue from a State tribunal against mortgaged property in the course of administration, comprising part of the effects of a succession represented by an executor, curator, or administrator. A very careful examination, on another occasion, of a question of this kind brought us to a different conclusion, and we accordingly held, in the case of *Boguille* v. *Faille*, 1 Annual Reports, 204, that an order of seizure and sale may be granted, by a court of ordinary jurisdiction, against property specially mortgaged in the hands of an administrator under administration. If, therefore, it be assumed that the jurisdiction of the Circuit Court is co-extensive with that of the ordinary State tribunal in all cases of law and equity, it would appear that the former had the authority to issue the order of seizure and sale in this case. The administration of the executor presented no valid objections to it.

*Garrard, Executor,* v. *William Reed,* 5 Robinson, 506. This case has no direct reference to the subject under consideration. An execution was issued on a judgment obtained against the plaintiff's testator, without any attempt to revive or make executory the judgment, and it was held not to be legally issued.

*Collier* v. *Stanbrough,* 6 Rob. 234. In this case, which appears to have been very fully argued, and which was determined at the same term with that of *Lowry* v. *Erwin,* it was held that the Circuit Court of the United States was without jurisdiction *ratione materiæ,* by reason of the property seized under execution being under the administration of a curator; and to the same effect is the case of *Kennard* v. *Stanbrough,* 9 Rob. 256.

In *Schroeder's Syndics* v. *Nicholson,* 2 La. 350, it was determined that, by a voluntary cession of property by an insolvent debtor, it vested in his creditors, and was not subject to an execution issued on a judgment rendered subsequently to the acceptance of the surrender.

It seems to us that the principal objection to the jurisdiction of the courts of the United States is one of inconvenience, and that the exclusive jurisdiction of the State courts is rather of apparent than real necessity. It is said that its exercise will have the effect of destroying the privileges and rights of creditors secured by our laws, for the benefit of the creditor who has the privilege of resorting to the United States' tribunal. We are certain that there is no legal right, privilege, or lien, which the courts of the United States would not respect in giving to the creditor the hypothecary remedy which he should enforce under their process, and which the defendant, be he executor, administrator, or curator, would be competent to assert and vindicate. If there should be any valid objections to the enforcement of the hypothecary rights, there is no reason to believe that they would be overlooked. In other words, there is no ground for supposing that the judicial power of the United States would be improperly exercised, any more than there is for believing that the ordinary tribunals would abuse their powers in ordering the property of successions

under administrators to be seized and sold under special mortgages. It may well be supposed that we are neither insensible nor indifferent to the rights of sovereignty of the State, but we have not been under the delusion that its legislation was in all cases supreme; and if inconvenience should result from the conflict between our own legislation and the rights which the courts of the United States are bound to maintain under the constitutution and laws made in pursuance thereof, it is equally our duty to support them. The supposed mischief produced by the paramount authority of the latter, is a necessary consequence of their supremacy on all subjects to which the legislative power of Congress extends, and the objections to it are objections to the constitution itself.

*Fischer* v. *Blight*, 2 Cranch, 397. Without going beyond the principles laid down in the case of *Boguille* v. *Faille*, before cited, it is obvious that, under the articles of the Code of Practice explanatory of the hypothecary action, we cannot hold the circuit of the United States to be without jurisdiction *ratione materiæ* in a case of this kind, and its proceedings to be nullified by reason thereof.

That court has determined in favor of its jurisdiction, and has also considered that the case before it was a proper one for its interference in the interest of the party who sought its aid. Judgments have been rendered both in favor of the original plaintiff and *Hunt*, and against the administrator, as has been before said, and they must stand.

It is a very difficult task to undertake to define and limit the authority of the United States' courts under their extensive chancery powers, particularly in the furtherance of rights created under a system of laws like ours. We have held that the hypothecary action, like all real actions, follows the property affected by the mortgage in whosoever's hands it may be found; and we cannot believe that, in any case, rights acquired under our laws, will, in any proceedings before them, be left without remedies, or that more difficulty will arise in this than in other cases of concurrent jurisdiction between those tribunals and those of the State. *Vide Gaines et ux* v. *Chew et al.* 2 Howard, 651.

Those rights thus secured, it would be the duty of the court to protect, as well as to control by proper means the execution of its process, so that they should not be infringed or violated; and to this end, at the instance of an administrator or executor, the equitable powers of the court would be called into action, to prevent a disturbance of a pending liquidation, or the recovery by one creditor of more than his share of the proceeds of the common pledge.

We do not feel any apprehension of any injurious result from the concurrent jurisdiction of the State and United States' courts. Our laws contemplate that property should be sold for the satisfaction of debts; and if the action of those charged with the administration of successions, solvent and insolvent, should be quickened by the concurrent power over them to a certain extent, neither the creditors, the debtors, nor the interests of justice, will suffer by it.

II. It is also urged on behalf of the plaintiff that, the order of the court directing the seizure and sale of the slaves was an absolute nullity, because it was made without notice to the party whose property was decreed to be sold, before the court had acquired jurisdiction over the defendant by service of its process, and was unwarranted by the law of the land.

In executory proceedings, no citation is necessary; the proceedings are *in*

*rem*, and notice of the order of seizure and sale is all that is necessary to be given to the debtor.

After *Davis*, the administrator, filed his bill, the order of sale of the 24th January was made, and it is evident that when the court made that order he, *Davis*, was considered to be in court, and that the order was granted adversely to him. It is impossible for us to suppose that a different state of things existed, for it is expressly mentioned in making the rule absolute, that no opposition was made to it, and the rule itself was taken on the counsel of the defendant. *Levy* v. *Fitzpatrick*, 15 Peters, 167. *Toland* v. *Sprague*, 12 Ib. 301.

The order of the 19th of February, by which that of the 24th January was rescinded and the sale ordered to be made in New Orleans, was made at the instance of *Hunt*, and is entered in the case of *William Hunt, complainant*, v. *Tobias Gibson, and T. V. Davis, curator of Claudius Gibson and others*, according to the record of that case. But though entered in that case it evidently is not confined to it, for it rescinds an order of sale made in another suit, and the slaves were held under the process of the other suit.

The service of the subpœna in *Hunt's* case was not made on *Davis* until the 26th of February, seven days after the order of the 19th of that month. The sale of the slaves took place on the 26th March in New Orleans, *Davis* residing in the parish of Carroll, five hundred miles from New Orleans. And in *Hunt's* case a final decree was entered on the 22d of June, 1842, against *Davis*, by which the proceeds of the sale were applied to the payment of his mortgage by preference over other creditors.

To this judgment *Davis* was a party, and this judgment was based on the fact of the sale, for it disposed in its very terms of the proceeds. The sale was made under the authority of a Court of Chancery, of property over which it had jurisdiction and of which it had the control. The defendant stands before us as a *bonâ fide* purchaser, holding under the decree. That court would never permit a purchaser to be disturbed in a case of this kind, but would maintain the validity of the sale. The proceeds have been applied to the extinguishment of an encumbrance existing on property of the succession, and holding them to have been lawfully applied, as the judgment imports, the validity of the sale is ratified, so far as relates to the succession of *Claudius Gibson*, a party to the judgment.

III. In this case, as has been observed, a petitory action has been brought for the recovery of the slaves, without regard to the judicial proceedings before recited, which are held to be nullities. We are not called upon to decide, as we can reach them from a very imperfectly prepared record, that they are in all respects regular; but we are not at liberty to treat them as nullities, and are bound to give effect to them as the proceedings of a court of competent jurisdiction with proper parties to them. In the language of the Supreme Court of the United States: "The jurisdiction of the court under whose order the sale was made over the subject matter, appears on the face of the proceedings, and its errors or mistakes, if any were committed, cannot be corrected or examined when brought up collaterally." *Thompson* v. *Tolmie*, 2 Peters, 169.

It is therefore decreed that the judgment of the District Court be annulled and reversed, and that judgment be entered for the defendant, with costs in both courts.